Helps Council, because otherwise it might have been confusing. Thank you. Okay, the next case before the court. Case number 161718, Russian Recovery Fund v. United States. It's an appeal from the Court of Federal Claims. I have to say, I have never seen so many initials, acronyms. I had to read the court's opinion about 15 times and your briefs about 15 times to make sure I knew what everything was standing for. All right, so. Now, I'm not going to pronounce your last name correctly. Hallward, I get that part. Hallward Dreemeyer. Dreemeyer. Okay. You want four minutes for rebuttal? Yes. Okay. May it please the court. I'd like to touch upon, albeit briefly, all three of the issues that are before the court, the statute of limitations, merits, and penalties. With respect to the statute of limitations, the government is seeking to assess a tax on Ms. Zimmerman's 2001 tax return, although the government conceded below that there was no RRF item on Ms. Zimmerman's 2001 tax return. In Electrolux, we interpreted attributable to, under a separate provision of the IRS code, to mean due to, caused by, or generated by. Do you contest the use of that definition here? Well, what I think is important about Electrolux is it added the adjective directly. Directly attributable to, and that's what we rely on. That this item on Ms. Zimmerman's tax return in 2001 is directly attributable to a fifth of 2001 partnership item. Electrolux rejected the tracing approach that the government is applying here. And when you apply tracing, as here, across tax years under TEFRA, you actually are acting inconsistently with the most fundamental premise of TEFRA. And that was the analysis that Judge Allegra applied in the Presta Holdings case. Do you agree that the Sente case is correctly decided, the analysis of Sente is correctly decided? Well, I'm not sure that the Sente case is correctly decided. But what I do think is salient about that case is that the IRS issued five FPAWs. There were three partnerships over two years. There was one that there was no change that was necessary. They issued five FPAWs because adjustments needed to be made at each of those points. And here the government cannot assess, you can't even determine what the tax is for Ms. Zimmerman in 2001 without first adjusting FIFIP's return both in 2000 and in 2001. And the government did not issue an FPAW for FIFIP. But in Sente, as I understand the facts of that case, what the tax court said is you have to go back to the source partnership. In that case, drilling and excavation. And you don't look at Sente, which was the pass-through partnership. And the only difference I can see between that case and this one is in this case not all the losses were consumed in one year. So there was a carryover. Right. But the carryover, it seems to me, if Electrolux stands for anything, it is that the carryovers don't really carry the attributable to force of attributable to when looking at a limitations period. Why isn't that right? To unpack that, I think there are two parts. One, in Sente, there was no indication that the intermediate partnership had done anything to the item other than simply pass it through in the tax year. There were two tax years. But in each one, it went directly from the source to the taxpayer straight through. And there was no indication that there was actually any application of the intermediate partnership's own tax attributes. And here there's no question but that FIFIP did apply its own at-risk and basis limitations to the RF item, thereby making it its own item. But CHIPRA says you have to do the FIPPA or whatever, however you pronounce that, whatever you call it, the FPAA, the Partnership Adjustment, at the point of origin. That's right. And here, so they had no choice except to do it at Russian recovery level. They do have to do an FPAA at Russian recovery. But the question is whether they also have to do an FPAA at FIFIP, given that FIFIP also applied its own tax attributes, its own at-risk and basis limitations. And then because of that, carried it over across years. And the problem with the government's theory is that it's inconsistent, as I said before, with the annual accounting principle, which is the fundamental premise of TEFRA. And one of the ways that we know that is the notice provision. So is your point of origin now becoming the secondary partnership? It's the directly attributable. The Zimmerman 2001 tax return, the item on that tax return as to which the government is trying to assess taxes, is directly attributable to the FIFIP 2001 partnership item. And partnership item is defined as an item for a partnership in a partnership tax year. So even in the definition of partnership item is this notion of tax year. But in 6229A and D, the statute of limitations provisions, the reference to taxable year, three, four times in those two subsections, plus every time you reference partnership item, there's an implicit tax year. Let me ask you a couple of tighter questions. I find this concerning. One is the Court of Federal Claims found that Ernst & Young failed performance duties evaluating. And I mean, I've sat on and argued a lot of CPA cases. Where in the record is there evidence that Ernst & Young fulfilled its obligations as a CPA? Well, Ernst & Young asked three questions. And I think they are the salient three questions. And this is on Appendix 40. First, whether Totger had made a contribution. And the answer to that is yes. Second, whether there was an economic reason for the contribution. And the answer to that is yes. And third, was the subsequent transfer to FIFIP related or premised on the contribution? And who did they ask those questions? They asked those questions to RRF. And to Mr. DiBiase. That's right. And he answered each of those questions correctly. And because of that, Ernst & Young's analysis was based on the information that they thought relevant. It was based on the full information that they provided. But they're trying to say that they relied on Ernst & Young's analysis based on those answers. But the Court of Federal Claims found that the knowledge of Russian recovery and the players in Russian recovery was overwhelming. Evidence of their knowledge that those answers were wrong was overwhelming. And the CPA didn't do any investigation at all. That's not what CPAs do. Well, the CPAs identified what the relevant questions were. Those three. And indeed, those three were the relevant questions. And if I may, for each of those three items, the trial court's findings actually are in our favor. As to whether there was a reason for the contribution, the court found that RRF had a legitimate business purpose to exist and a legitimate purpose to seek in-kind contributions. RRF didn't have cash to purchase Tiger's CLNs. They wanted in-kind contributions, and there was a good reason to do so. RRF and Tiger did make a contribution. The documents, the partial documents were clear. What due diligence did Tiger perform? What due diligence did Tiger perform? Well, the record is clear that there was actually a negotiation between the parties about the terms of the memorandum and the side agreement. And Tiger knew of Ms. Zimmerman and that she was a sophisticated investor. But Tiger's interest in making this contribution was to be clear that they were diversifying the nature of their holdings. Prior to this, they held CLNs. There was no market for CLNs. And Tiger has testified that their purpose was to dump these CLNs as fast as possible via a sale. And however it was characterized, what they really intended was to sell these things. But, Your Honor, they may have wanted to sell to RRF, but RRF wasn't buying. RRF didn't have the cash to buy. RRF was looking for in-kind contributions. But the trial court found that both RRF and Tiger collaborated, that was the court's word, on a scheme which had the effect of converting what on its face looked like a partnership investment into a sale. Because eight days, as it was understood going in, would happen, whether it's eight days or three weeks or a month, there was going to be a conversion that would cash out Tiger's interest in the CLNs. And that was Tiger's interest, and that was what RRF knew. If I may, when the court actually comes up to the specific question, was it a prepackaged deal from beginning to end all the way to the sale to FIFIP on page 24 of the appendix, it says, may indeed, may indeed have been orchestrated from beginning to end. It stops short of making that finding, and it stops short of making that finding for a reason, because it can't. In its own analysis of FIFIP's involvement, it is on June 1, after Tiger has already made the investment in RRF, that FIFIP comes into the picture. At that time, what the testimony is, and this is both on appendix 16 and on appendix 20 and footnote 16, that Tiger was offering to sell its RRF shares. It was looking for a buyer. It intimated that it had a buyer outside of RRF and its orbit and wondered whether FIFIP would be interested. It offered them at that point at a discount. FIFIP was an absolute value return, absolute return fund, and once it knew that it was being offered at a discount, it met its investment objectives and it could do so. That all happens after Tiger has contributed its assets into RRF. What's the relationship between how much overlap is there in the partnership of RRF and FIFIP? They have different investors. There's a lot of overlap. I don't know exactly the percentage, but they have not only some different investors, they also have different investment objectives. And so those who are making decisions have to make their decisions with a fiduciary duty to the particular investors and the particular objective of that fund. So for FIFIP, which is an absolute return fund, it's not until they have the discount at which Tiger is offering it that it makes it an attractive investment that matches their investment objectives. And that doesn't happen until more than a week after Tiger is in. What's the relationship between Bracebridge and FIFIP? FIFIP is related. Ms. Zimmerman is involved in both and she is a principal in both. So there's no question that there's – but they are separate and they have, as I said, separate investors. There's a fiduciary obligation to them separately and to their different objectives. And so what's interesting here is that the judge walked up to and didn't find that it was prepackaged all the way to FIFIP because he couldn't. The facts are to the contrary. What he had to find is that there was no non-tax avoidance purpose in Tiger's initial investment. Well, Your Honor, the court found – and again, these are the court's own findings – that Tiger's investment was at risk in RRF for as long as it was there. And it also made the finding that RRF made a profit wholly apart from the tax attributes. This court has said in the Salem financial case that one test of whether it's bona fide business purpose is whether if you set aside the tax benefits, it is profitable. And here they made a profit of $7 million in 1999. They made 225% return in 1999, 105% return in 2000, even before taking account tax. Right, but a partnership can have some bona fide purposes and some non-bona fide purposes. Well, but again, the court found – this is the court's own findings – that it was a legitimate business purpose of RRF to seek in-kind contributions. Yes, yes. That was the initial purpose of RRF. That's fine. RRF was a legitimate operation. But as Judge Brueggen said, that's when the Tiger transaction and the CLNs came up. That's when things went south. And that's when – all that's required in order to find that this is an abusive tax shelter is that there is an improper purpose behind this transaction, not that there'd be an improper purpose behind the partnership. But there was a legitimate purpose to seek in-kind contributions. RRF didn't have money to buy Tiger's interest. Tiger was agreeing to be bound and couldn't redeem until July. If it decided to stay longer than that, that was fine. Tiger's successors were bound to the memoranda. Their rights were the same. And interestingly, the side agreement that the government points to actually makes clear that Tiger had no right to cash out, that it was in the sole discretion of RRF whether to give them in-kind. It could be something else in-kind. But if RRF knew that it had $200-plus million in potential losses sitting there, if it allowed Tiger to cash out, of course it was going to allow Tiger to cash out. And what's different in this case? This case has none of the hallmarks of any of the other cases that there were sham partnerships found or economic substance. There was no purchase of tax attributes. In fact, FFIT bought it at a discount. They didn't pay for tax attributes. They bought it at a discount. And there was no— What they sold was liquidity. That's what Tiger bought. What they sold was liquidity, and that is a legitimate business purpose of Tiger. Tiger was sitting with non-marketable CLNs, and what they obtained based on this contribution was liquidity. They now had shares in RRF, and there were investors who would not want to— And they had an asset, which was all these losses that they could, they hoped, pass on to a U.S. taxpayer. And yet no one paid for them. That's because the purpose of making those investments was for their own return. And they all did have returns. The only payment for them was the availability of liquidity. The court's cases say that it has to be the sole purpose to be taxed, and here it was not. There was a different profit motive. But if I could just for a second go back to statute of limitations because I want to urge the court to look very carefully at Judge Allegra's decision in the press-upholding case because the jurisdictional deposit issue is just the flip side of the statute of limitations. And Judge Allegra is explicit that he disagrees with Judge Brueging's analysis of this, and he goes on at length explaining why it is that that analysis is utterly inconsistent with the annual accounting rule and most importantly with respect to notice because the 5th of 2001 partners don't get notice of the RRF 2000 FPAW. Indeed, they don't have a right to participate in the 2000 RRF FPAW proceeding, and as this court held in the Pratty case, they absolutely have to raise any statute of limitations objection in the partnership proceeding, and yet they can't even be a party to it. Thank you very much. We'll give you two minutes to close up. Thank you. Good morning, and may I please the court. Andy Weiner for the United States. Mr. Weiner, to your opposing counsel's last point, should we disregard the annual accounting principle when constraining 6229, and if so, why? Well, I would take issue with the disregarding part. I don't think the annual accounting principle is at issue here. What Mrs. Zimmerman reported on her 2001 return was a substantial portion of the Section 988 losses that were attributable to RRF's 2000 return, and so when you eliminate those losses for RRF and you apply that through a computational adjustment to Mrs. Zimmerman, that eliminates her losses that she herself claimed in 2001, so you're not looking at tax items in different years. She's the one who claimed the losses in 2001, and by virtue of those losses being disallowed, then she loses the benefits of those losses in 2001, so the annual accounting principle, I think, is misapplied here. What about the argument that there should have been a partnership adjustment issued to FFIP? Well, Your Honor, I think that the plain language of the statute, 6229, addresses this, and I think all the court really needs to do is look to the plain language. It says that an FPOP, notice that the IRS provides, that a partnership tolls any open limitations period for any tax of any person attributable to, which makes it the operative language here, the partnership item for the year at issue in the FPOP, and so here you've got the Section 988 losses that were claimed on the 2000 return of RRF, and that tolls Ms. Zimmerman's limitations period for 2001 because her losses, the portion that she claimed in 2001, is clearly attributable to the losses that were originated on RRF. But were they adjusted because of the FFIP? They flowed through FFIP, and incidentally, they also flowed through a number of other partnerships, but the important part is that basically the whole way the TEFRA scheme works is you're supposed to address the losses at their source. You cut the head of the snake, not the tail, so that you can have one unified and consistent proceeding that will apply to everybody who makes use of those partnership losses, and so the fact that FFIP might have limited their use of losses in one year and carried it over to another year doesn't have any bearing on whether those losses were legitimate in the first place. What is the difference? To pick up on and follow up on Judge O'Malley's question, what is the difference between this case and Sente, which seemed to me to be a pretty clear articulation of the attributable to rule as applied in roughly this context, between that case and this case? Which is another way of saying what was FFIP doing that distinguishes it from Sente? Nothing. Well, your opposing counsel said a lot, so could you address his argument? I understand, but the government's position is to hear one side say nothing and the other side say a whole lot.  That's what they did. Now, that doesn't have, they're still the same losses that originated from RRF. Well, let me ask this question this way. I want to hear everything you have to say, but maybe this is a way to frame it. If FFIP had had enormous gains during the year, half a billion dollars in gains, and could have disposed of that entire loss in one year, would this case be, was there anything else that they were doing that would distinguish what they did from Sente? I think the answer is no, but let me put it in terms of Sente. What Sente did was they had two source partnerships for the loss that was being challenged by the taxpayers in that case. You had an intermediate partnership, Sente, which was engaged in its own transactions that had nothing to do with the loss that was being challenged that was flowing through drilling and equipment. And so when the IRS issued the FPA, the intermediate partnership, which it did properly because it was also contesting these other transactions that had nothing to do with drilling and equipment, what the taxpayers in Sente did was say, hey, we want to also challenge this other, this partnership item that was adjusted. And the court said, no, you have to adjust the partnership items at the source for the reasons that that's what the TEFRA scheme requires you to do in order to have a unified proceeding. The rules regarding computational adjustments, the definition of flow-through partner, they all point in the same direction, adjust it at a source. And in addition, as my opposing counsel says, you had to adjust it both at the RRF level and at the FFIP level. That makes no sense. It begs for duplicative proceedings. It begs for inconsistent results. If there's a proceeding regarding RRF that said that the losses were improper and invalid and eliminates those losses, there is nothing that could happen in a proceeding in FFIP that would revive those losses. The fact that they limited the amount of losses that they claimed doesn't actually have any bearing on their validity. Were there any other returns of any other partners that remained open as of 2001? I believe so. The way that the court structured the proceedings with respect to the statute of limitations issue was that Zimmerman represented not just herself but all the partners whose returns were filed within three years of when the IRS then issued the FPA. And then DiBiase represented a group of partners who filed their returns before the three-year period that finished. How many partners fell into Ms. Zimmerman's category? My understanding is most of the partners fell into Ms. Zimmerman's category. There's some pending text cases still, right? Yes, because the way that RRF, Russian Recovery, claimed the built-in losses was they did it in a structured way. So they claimed a couple of them by the sale of... So remember, when they sold the losses to General Segar, they sold 77%. So they kept 22% and changed. And the losses at issue here are based on the sale of the 22%. And then what they did was when they sold those losses to General Segar, they got back preferred stock. And so they got a substitute basis in the built-in losses from the credit-length notes, then substituted to the preferred stock, and then they had those in their pocket so they could trigger those losses whenever they wanted. So they triggered them in 2004, three years later. And so then if you add up both losses from 2000-2001, you come up with $222 million, which was the built-in loss that was transferred from TIGER to RRF in a fictitious contribution transaction. Now, to get to the merits of that transaction, the important part is that everybody knew that TIGER was transferring their loss. I want you to address that Ernst & Young point that you made in your brief. I found it very disturbing. Well, I think that clearly your understanding of the record is correct. Ernst & Young... I went into the record looking at it. They've said... The CPA doesn't act that way. Doesn't call and say, hey, tell me what I should say, and then relies on that, which is what happened. And during my opposing counsel's argument, he did say that at one point the CPA said, was this transaction an economic substance, and then waited for an answer for six months, and then DiBiase finally gets around to sending a memo in which he basically, just in a conclusory way, says, yes, there is economic substance here. That is not commensurate with reasonable cause and good faith. What about the point that your friend on the other side makes about the fact that the Court of Federal Claims didn't actually make the finding that you're relying on, which is that there was no economic substance and that this was planned all along, that he said it's possible that it was planned all the way through? Well, Your Honor, I think that the court below is being actually very careful and deliberate, but not in a way that has any bearing on the results in this case. The transaction was planned because Tiger knew that it was selling the losses. RRF, there's a, on page 13 of the appendix, the court's opinion, and from page 38 to 40, there are specific findings with respect to RRF was interested in purchasing these assets for their tax value, acquiring these assets for their tax value, and from 38 to 40, the court goes into extensive findings with respect to the fact that RRF and Tiger collaborated on a scheme to do just that. And the fact that, so clearly, in order for those losses to be transferred, what's very important here is, in order for those losses to be transferred, what happened is Tiger had to purportedly or ostensibly contribute them to the partnership and then immediately get out, or at least get out before they were managed or otherwise, you know, profited from. Because if they were still in the partnership when those assets were disposed of, then Tiger would have gotten losses under 703. Which they couldn't use. Which they couldn't use. That's the whole point. The whole point is for them to contribute them and then get out so that somebody else who is a U.S. taxpayer can then step into their shoes and claim those losses. But is it possible that Russian recovery and Tiger had no economic purpose but that FFIP did? No, Your Honor. Well, first of all, I think that the issue here is actually between, the question is whether Tiger became a bona fide partner of RRF. And so FFIP, the question that the Supreme Court tells you to ask in determining whether that was a bona fide transaction or not, or whether those two parties genuinely, truly intended to join together in the conduct of a business. And so you're looking primarily to the intent of RRF on the one hand of the transaction and Tiger on the other. And the court squarely found that neither of those parties intended that they bona fide enter into a business together because the whole point was for Tiger to get out. So it was a disguise sale as the court characterized it properly. Now, what the record shows is that the parties were planning this transaction since May. What the record also shows is that RRF was keenly focused on tax losses in emails from April and May, in which the transaction happens at the end of May. What the record does not necessarily show was that they had the buyer for Tiger's partnership interest, which Tiger then sold on June 3rd, arguably a week or two after becoming a partner, had sold its partnership interest on June 3rd to FFIP. There's no indication in the record that Tiger was specifically supposed to sell to FFIP, which is why the court, I think, said, the whole transaction looked to probably be mapped out all in advance. But admittedly, the first indication that FFIP was going to be the buyer of Tiger's interest was in a correspondence on June 1. But what is perfectly clear is that come hell or high water, Tiger was getting out of that partnership. And the whole structure of the transaction was that Tiger sells. And so the fact that it wasn't necessarily selling to FFIP doesn't matter because the subsequent steps of the transaction were perfectly mapped out, that RRF was supposed to sell these assets to General Segar, which actually Deutsche Bank disclosed to the IRS in a registered transaction as a registered transaction back in March and said that these assets were in the Caymans, which is where RRF was incorporated. And so most of the details had come out in the course of the evidence. Now, the one fact of FFIP purchasing it might not have been clear from the record as a pre-planned step. But that step was necessarily supposed to happen. And that's the fundamental point. And it's the key step in the whole transaction. Before you sit down, we've got a different court of claims judge that concluded the opposite legally with respect to the legal proposition on how the statute of limitations is supposed to operate. And so what are we supposed to do with that? Your Honor, I respectfully disagree. If the reference was to pre-sub, that has to do with the requirement that in order to bring a case in the court of federal claims, you have to make a statutory deposit. Where if you had gone to tax court, there's no statutory deposit requirement. The court said, well, for statutory deposits, we're only going to look to the taxpayer's one tax year. Because if you look to more than one tax year, then you run afoul of the annual accounting principle. But that has nothing to do with the, that is a completely different question as to the statute of limitations issue, which says that all tax of any person, not partner even, of any person attributable to the partnership items for the tax year issue in the FPOC are suspended for the duration that you can bring a proceeding based on the FPOC or for one year thereafter. And so here, the attributable to language that Judge Wallach had mentioned that the court had already established in her lecture walk saying attributable means generated by, caused by, that is perfectly consistent with looking to the source partnership. And I see if I run out of my time. In addition to that, Your Honor, and I'll stop. I'll give you a few seconds to finish up, just because I'm ready to run over. In addition to that, that, I'm sorry, I lost my train of thought. But I would just say that the court's case law is perfectly consistent with the result here with respect to the statute of limitations. OK. Thank you. All right, two minutes. With respect to the statute of limitations, there can't be a computational adjustment here, because you can't know the effect on the individual's 2001 return without first adjusting the FIFIP return. FIFIP had combined this loss with other income and losses it had from other sources. And then taking that whole and applied basis and at-risk limitations, we can't know what the effect is for the individual's 2001 return without adjusting that. And the government, as much as said so on page 38 of the red brief, implying that FIFIP had done something wrong. Whether FIFIP did anything wrong, we can't know until we adjust FIFIP's return, which we can't do, because the government investigated and issued a no-change letter. That no-change letter in 2001 is what the FIFIP 2001 partners, like Ms. Zimmerman, received with respect to their 2001 returns, not a notice of an FPAW that made them know that they were supposed to participate in the proceeding to raise any objections. With respect to Judge Allegra's opinion, he specifically rejected the notion that we do multi-year adjustments. He rejected that as inconsistent with the fundamental premise of annual accounting. With respect to the merits, the government and the judge below implicitly add into the requirement a durational minimum for being a partner. That is inconsistent with this court's decisions in Falconwood, as well as the decision in 70 Acres. This case would come out the same way if the sale to FFIP had occurred the next day after the contribution? Because 70 Acres is a case in which the partnership existed for a day, and that was enough. For the time that Tiger Woods invested, it was at risk. It wouldn't give us a very sound basis for concluding this really wasn't a partnership investment. It was a sale. Well, it would be hard to think. One of the things, of course, I've emphasized is that FFIP doesn't come on the scene until June 1st, which is more than a week after. It would be hard to imagine that that would be possible in the circumstance of a day later. With respect to penalty, they hired the best. The taxpayer doesn't have to know what it is that the accountant is supposed to ask. They're supposed to be able to rely on them. And although the government referenced General Segar several times. The accountant relied on the taxpayer. Well, and the taxpayer relied on what questions the CPA was asking. But the government refers to General Segar. With respect to penalty. Right, but the Court of Federal Claims made a specific finding that the taxpayer knew that the answers to those questions were not true. Well, and we discussed why I think that's inconsistent with the court's other subsidiary findings. But specifically with respect to penalty, the government mentioned General Segar several times. The government investigated General Segar's taking of a loss as to these specific items and had a no change letter. If the government's own investigators concluded that this was appropriate, it's hard to understand how it is that the taxpayer is supposed to know that something was wrong. Thank you very much.